## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

DOROTHY L. EDWARDS,                )
                                   )
            Plaintiff,             )
                                   )
v.                                 )         Case No. 05-CV-0454-CVE-SAJ
                                   )
CREOKS MENTAL HEALTH SERVICES,     )
INC.,                              )
                                   )
            Defendant.             )

## OPINION AND ORDER

Now before the Court is Defendant's Motion for Summary Judgment (Dkt. # 48).  Plaintiff

Dorothy L. Edwards ("Edwards"), appearing pro se, filed her complaint on August 8, 2005 alleging

that defendant Creoks Mental Health Services, Inc. ("Creoks") discriminated against her on the basis

of her religion and disability in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"),

42 U.S.C. § 2000e et seq., and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §

12101 et seq.  Plaintiff also alleges that defendant fostered a hostile work environment and retaliated

against her after she filed for unemployment benefits.  In addition to her federal claims, plaintiff

alleges that defendant is liable for defamation, intentional infliction of emotional distress, and breach

of contract.[1]  For the reasons set forth below, the Court finds that defendant is entitled to summary

judgment on all of plaintiff's claims.

---

[1]  In its motion for summary judgment, defendant also argues that it is entitled to summary judgment on plaintiff's claim of "negligence of employee rights." Dkt. # 49, at 5.  However, such a claim does not exist under either federal or Oklahoma law.  Moreover, plaintiff's complaint does not sound in negligence; thus, the Court will not address the claim of "negligence of employee rights."

## I.

Creoks is a non-profit corporation that provides mental health services to low-income individuals throughout Northeastern Oklahoma.  Dkt. # 49, Affidavit of Brent Black ("Black Affidavit"), ¶ 4.  Creoks services are provided by licensed therapists ("LPCs") and other professionals, including individual rehabilitation specialists and case managers.  Id.  Individual rehabilitation specialists are professionals who teach clients skills such as relaxation therapy or other life skills.  Dkt. # 49, Black Affidavit, ¶ 7.  Case managers refer clients to different sources to help them with their needs.  Dkt. # 49, Edwards Deposition, Part 1, at 11.

An individual who qualifies for treatment by Creoks is first interviewed by an LPC, who determines what services that individual should receive through Creoks.  Id., ¶ 5.  If the LPC determines that the client needs individual rehabilitation or case management, then an individual rehabilitation specialist or case manager is assigned to that client.  Id.  According to Brent Black ("Black"), the chief executive officer of Creoks, the services can be terminated at the election of either the LPC or the client.  Id., ¶ 6.

On April 8, 2004, Edwards entered into a contract with Creoks entitled "Subcontractor Agreement."  Dkt. # 49, Edwards Deposition Ex. 1, Subcontractor Agreement.  The Subcontractor Agreement stated that Edwards would provide individual rehabilitation or case management services.  The dates and time of services were to be determined based on client need.  The Subcontractor Agreement further stated that the "services will be delivered and documented in conformance with Creoks policies, procedures, and protocols."  Id.  On April 8, 2004, Edwards also signed a document entitled "Verification of Creoks Personnel Policies."  Dkt. # 49, Edwards Deposition Ex. 2.  This form stated: "I have received a copy of the personnel policies and understand

2

that it is my responsibility to become familiar with its contents. I agree to abide by all of its rules, policies, terms, and conditions, realizing that failure to do so may result in disciplinary action and/or termination." <u>Id.</u>  Further, the document stated: "I understand and agree that my employment is terminable at will so that both the agency and I remain free to choose to end our work relationship at any time and for any reason or for no reason at all without either party incurring any liability." <u>Id.</u>  Creoks contends that, during her association with Creoks, Edwards was free to provide similar services for other human service providers.  Dkt. #49, Ex. 1, ¶ 7.  Indeed, Edwards provided some services for Madonna House in 2004, while she was working at Creoks.  Dkt. # 49, Edwards Deposition, Part 1, at 15.

During Edwards' association with Creoks, Creoks had in place a dispute resolution/grievance procedure.  Dkt. # 49, Edwards Deposition Ex. 9.  According to this policy, if an employee had a grievance, including alleged discrimination based on religion or disability, the employee should present a written request for formal review by the employee's supervisor.  Edwards never filed a written complaint pursuant to this policy.

Edwards performed individual rehabilitation services at Creoks' clients' homes.  Edwards wrote her own treatment plans and had control over the methods used to provide the services. Dkt. # 49, Edwards Deposition, Part 1, at 14.  She submitted her treatment plans to Black for approval. <u>Id.</u>  While she was supposed to seek Blacks' approval only in the beginning of her employment to "get the swing of things," Edwards recalls seeking his approval beyond the first few weeks with Creoks.  <u>Id.</u>  Creoks provided Edwards with paperwork and supplies, but she conducted her treatment work at clients' homes and completed paperwork at her own home.  <u>Id.</u> at 15-16.

Creoks paid Edwards by the job and did not deduct income tax for payment of her services to Creoks' clients. Dkt. # 49, Ex. 1, ¶ 8.  In her 1099-forms, Creoks listed Edwards' payment as "non-employee compensation."  Dkt. # 49, Ex. B.  Edwards took business-related tax deductions for mileage and other expenses that she incurred in 2004 as a result of her work for Creoks.  Dkt. # 49, Ex. C.  When she was hired, Edwards was told that she was an independent contractor.  Dkt. # 49, Edwards Deposition, Part 1, at 12.  Black maintains that, at all times, Creoks considered Edwards to be an independent contractor.  Dkt. # 49, Ex. 1, ¶ 7.  However, Edwards argues that the Oklahoma Department of Labor classified her as an "employee" and not an "independent contractor" in granting her unemployment compensation benefits.  Dkt. # 50, at 7.

Edwards testified that she suffers from a "generalized anxiety disorder."  Dkt. # 49, Edwards Deposition, Part 2, at 19.  Edwards never told management about her disability.  Id.; Dkt. # 49, Black Affidavit, ¶ 13.  According to Edwards,

> There was no need to [tell management about my disability].  I needed no accommodations.  I – I have – I can do my job, and I can do it well.  I have problems within myself, and I have problems when I'm being pressured or whatever.

Dkt. # 49, Edwards Deposition, Part 2, at 19.  Edwards told only Audrey Milton ("Milton"), another Creoks employee, about her disability.  Id. According to Edwards, Milton commented that Edwards could not perform her job responsibilities because of her anxiety disorder.  Id.  Milton did not make such alleged comments to Edwards directly, but to other undisclosed Creoks employees.  Id.

Edwards claims that an undisclosed person, who Edwards refers to as her "slanderer", see Dkt. # 49, Edwards Deposition, Part 2, at 1, called Creoks and made negative comments about her. Id. at 21-23.  Edwards does not have any evidence that anyone made such a call; however, she "believes within my heart and soul some – the information got to [Creoks' employees] some kind

4

of way." Id. at 22.  According to Edwards, the other Creoks' employees turned against her after they heard these allegedly slanderous comments.  She argues that, due to the comments by this "slanderer," the LPCs removed Edwards from their treatment plans.  Id. at 25.  She testified, "[The LPCs] didn't choose for me to work with them anymore after hearing all the gossip and the slander that was called in by my slanderers to Creoks."  Id.  Prior to her termination, Edwards filed a complaint to the licensure board on the ground that the LPCs decision to take her off of their treatment plans was "unprofessional."  Id. at 19.

Edwards also complained that some of her co-employees made disparaging comments about her.  For example, on one occasion, Milton asked her if she was schizophrenic.  Id. at 2.  Edwards also claims that "a big issue was made over the fact that I was a Jehovah's Witness."  Id. at 15.  Milton told Edwards that she (Milton) was shocked that Edwards was a Jehovah's Witness.  Id.  Edwards testified, "I feel it was discriminative [sic] when they even talked about [my religion] negatively."  Id.

During her association with Creoks, Black maintains that Edwards struggled to perform her duties in accordance with Creoks' policies and procedures.  Dkt. # 49, Black Affidavit, ¶ 9.  First, Creoks asserts that Edwards impermissibly taught religion to her clients.  For example, Edwards had a client who "was terrified of going to hell because of the religious teachings she had." Dkt. # 49, Edwards Deposition, Part 1, at 22.  Edwards met with the client and "wrote her treatment plan in an effect where she could go to the Bible on her own and learn what the Bible itself had to say about that hellfire thing or whatever else was giving her problems."  Id.  She maintains that "teaching her how to go to the Bible and form her own opinions about what was true and what was false" did not constitute religious "witnessing."  Id., Part 2, at 17.  In addition to teaching a client how to read the

Bible, Edwards took a client to a Jehovah's Witness meeting with her. Id. at 15. She maintains that, at the time, she did not know it was improper to take a client to a religious meeting. Id.

Creoks management was also concerned that Edwards accepted some clients who were not covered by Medicaid because Creoks' sole source of revenue was through Medicaid. Dkt. # 49, Edwards Deposition, Part 1, at 20. However, Edwards testified that Black granted her permission to accept some non-Medicaid clients. Id. at 20. She remembers one instance where Black did not permit her to accept a non-Medicaid client. Id. at 20-21.

Edwards admits that she had difficulty adhering to the Creoks' procedures for filling out and completing paperwork. Id. at 21. However, she maintains that all the Creoks employees had problems filling out paperwork according to Creoks policies. Id.; Dkt. # 50, Edwards Affidavit, ¶ 10.

On November 8, 2004, Black met with Edwards to discuss her alleged infractions of the Creoks policies and procedures. Black gave her a written memorandum setting forth "specific directives . . . that [Edwards was] to follow, no exceptions." Dkt. # 49, Ex. D. The memorandum set forth the following directives:

(1) You are never to initiate or discuss issues relating to religion with clients.
(2) You are never to transport a client anywhere for any reason, no exception.
(3) You are only to do services of individual rehab with Medicaid clients
(4) You are not to do any case management services at all – indefinitely
(5) No other services but individual rehab Medicaid will be paid to you
(6) You are not to do any services at the Sapulpa office at all
(7) You are not to have any contact with [particular Creoks' client] at all
(8) You are to turn in Medicaid goals/objectives for individual rehab to clinical coordinator for approval before providing any services. Not doing so will prevent you from being paid until they have been approved.
(9) All Medicaid clients that you see must already have a mental health assessment and treatment plan done by a therapist first.
(10) You are never allowed to remove a chart from the office.

6

(11) You may look through open Medicaid charts to find clients who need individual rehab to build up your client load.

Id.  The memorandum further stated, "If at anytime after this you fail to abide by these directives, you will be subject to disciplinary action, up to possible termination."  Id.  Plaintiff admits that, on at least one occasion after the November 8, 2004 meeting, she violated these directives by transporting a client.  Dkt. # 50, at 9-10.

On March 14, 2005, Creoks terminated its Subcontractor Agreement with Edwards.  In a meeting with Edwards, Black informed Edwards that she was terminated because she violated Creoks policies, had too many issues with her co-workers, and caused Creoks to lose money.  Dkt. # 49, Edwards Deposition, Part 1, at 19.

Before her termination, in February 2005, Edwards filed a claim for unemployment.  Id. at 24.  According to Edwards, she filed this claim because, after some LPCs had taken her off of their treatment plans, she had only three or four clients.  Id. at 25.  She was approved for unemployment compensation sometime in July or August of 2005.  Id.

Subsequent to her termination, Edwards filed a claim for unpaid wages with the Oklahoma Department of Labor.  This claim was ultimately settled and is not the subject of this litigation.  Dkt. # 49, Ex. F.   Edwards also filed a claim with the Equal Employment Opportunity Commission ("EEOC"), stating:

> I believe I have been discriminated against because of my religion, Jehovah Witness, in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII").  I also believe I have been discriminated against because of my Disability, in violation of Title I of the Americans with Disabilities Act of 1990 ("ADA").  I further believe that I have been retaliated against for having filed an unemployment claim with the Oklahoma Employment Security Commission.

Dkt. # 49, Ex. H.  Edwards' charge was dismissed because the EEOC was unable to conclude that the information it obtained for the charge established a violation of Title VII or the ADA.  Dkt. # 49, Ex. I.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 317.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment.  Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

## III.

Reading the complaint liberally and in the light most favorable to plaintiff, the Court interprets plaintiff's complaint to state the following claims: religious discrimination in violation of Title VII, hostile work environment in violation of Title VII,  retaliation for having filed an unemployment compensation claim, disability discrimination in violation of the ADA, defamation, intentional infliction of emotional distress, and breach of contract and/or bad faith breach of contract.  The Court will address each of these claims, in the order listed above.  The Court finds that defendant is entitled to summary judgment on each claim.

## A.

In examining plaintiff's Title VII and ADA claims, the Court must first determine whether plaintiff was an employee of Creoks or an independent contractor.  "[T]o establish a prima facie case under Tile VII, [plaintiff is] required to prove, among other things, that [defendant] was her employer.  Lockard v. Pizza Hut, Inc., 162 F.3d 1062, 1069 (10th Cir. 1998); Briston v. Bd. of County Comm'rs of the County of Clear Creak, 312 F.3d 1213, 1217 (10th Cir. 2002) (noting the same for claims under the ADA).

To determine whether plaintiff has demonstrated an employee-employer relationship for purposes of federal anti-discrimination legislation, the Tenth Circuit has adopted the "hybrid test." Lambertsen v. Utah Dept. of Corrections, 79 F.3d 1024, 1028 (10th Cir. 1996); Briston, 312 F.3d at 1217 (applying the hybrid test in the ADA context).  Generally, and in this case, the focus of the test is to determine whether plaintiff is an employee or an independent contractor.  Lambertsen, 79

9

F.3d at 1028 n.1.  Under the hybrid test, the "main focus of the court's inquiry is the employer's right to control the 'means and manner' of the worker's performance."  Id. (citations omitted).  The hybrid test also looks to other factors, including:

> (1) the kind of occupation at issue, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the employer or the employee furnishes the equipment used and the place of work; (4) the length of time the individual has worked; (5) the method of payment, whether by time or by job; (6) the manner in which the work relationship is terminated; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the employer; (9) whether the worker accumulates retirement benefits; (10) whether the employer pays social security taxes; and (11) the intention of the parties.

Id.; see also Sivosa v. Nat. Inst. of Standards & Tech., 282 F.3d 1320, 1328 (10th Cir. 2002).  No single factor is determinative; rather, the Court looks to the totality of circumstances surrounding the working relationship between the parties.  Lambertsen, 79 F.3d at 1028.

Here, application of these factors weighs in favor of plaintiff being an independent contractor.  First, plaintiff was told by Creoks that she was an independent contractor.  Second, plaintiff's contract with Creoks was entitled "Subcontractor Agreement."  She was even told that she was employed as an independent contractor.  Even though there are references in Creoks documents to "employment," that term can include employment as an independent contractor.  Further, plaintiff was paid by the job, rather than by salary or hourly.  Defendant classified plaintiff's payment as "non-employee compensation" in her 1099-forms, and it did not deduct taxes from her compensation.  Also, plaintiff was free to form contracts with other service providers.  During her tenure at Creoks, she conducted some work for Madonna House. Plaintiff conducted most of her work at clients' homes or at her own home.  Finally, plaintiff had substantial latitude in determining the type of rehabilitation appropriate for each client.  However, given that Black approved plaintiff's

treatment plans, she did not have complete control over the "means and manner" of her employment.

Examining the totality of circumstances, the Court finds that plaintiff was an independent contractor. Despite the fact that Black acted as her "supervisor" in some respects, plaintiff retained much control over the means and manner of her employment. Most importantly, by signing an employment contract entitled "Subcontractor Agreement," plaintiff consented to her status as an independent contractor. Because she was an independent contractor, plaintiff cannot bring claims under either Title VII or the ADA.

**B.**

Even if plaintiff were an employee for federal anti-discrimination purposes, the Court nonetheless finds that defendant is entitled to summary judgment on her religious discrimination claim. Title VII prohibits an employer from discharging "any individual . . . because of such individual's religion." 42 U.S.C. § 2000e-2(a)(1).[2] Since there is no direct evidence of intentional discrimination, the Court evaluates plaintiff's Title VII claim according to the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). To survive summary judgment under Title VII, plaintiff must first establish a prima facie case of unlawful discrimination. Here, the appropriate prima facie case for plaintiff's religious discrimination claim

---

[2]    Under Title VII, an employer is also required to reasonably accommodate an employee's religious practices or beliefs where accommodation does not cause undue hardship to the employer's business interests. Shapolia v. Los Alamos Nat'l Lab, 992 F.2d 1033, 1037 (10th Cir. 1993). However, a religious accommodation is distinct from a "straightforward disparate treatment claim." Id. Here, plaintiff alleges that her termination was motivated by an animus directed against her on the basis of her religion. She does not claim to have needed any accommodation as a result of her religion. Thus, the Court addresses plaintiff's religious discrimination claim according to the burden-shifting analysis set forth below.

requires a showing that: (1) plaintiff is a member of a protected class; (2) she was qualified to perform her job; (3) despite her qualifications, she was discharged; and (4) the job from which she was terminated was not eliminated.  Perry v. Woodward, 199 F.3d 1126, 1140 (10th Cir. 1999). According to the Tenth Circuit, "the termination of a qualified minority employee raises the rebuttable inference of discrimination in every case in which the position is not eliminated." Id. If plaintiff establishes a prima facie case, a presumption of discrimination arises.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).

If plaintiff satisfies her burden of establishing a prima facie case, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for the employment decision. McDonnell Douglas, 411 U.S. at 803; Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 (1981); English v. Colorado Dept. of Corrections, 248 F.3d 1002, 1009 (10th Cir. 2001).   At this stage, defendant need not rebut evidence established under the first step; it must only rebut the inference that it acted out of discriminatory animus.  E.E.O.C. v. Flasher Co., Inc., 986 F.2d 1312, 1318 (10th Cir. 1992).   The ultimate burden of proving discrimination remains at all times on plaintiff.  Burdine, 450 U.S. at 253.  If defendant carries its burden of production, the presumption of discrimination drops out of the case. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993).

Finally, the burden shifts back to plaintiff to show that defendant's stated non-discriminatory reason is mere pretext for unlawful discrimination.  Rivera v. City & County of Denver, 365 F.3d 912, 920 (10th Cir. 2004). To show pretext, plaintiff must produce evidence that would, if believed by the trier of fact, show that the true reason for the action was discriminatory.  Plaintiff can produce evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in

the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997).

Here, plaintiff is a Jehovah's Witness who was qualified to perform her job as an individual rehabilitation specialist and case manager. Plaintiff had an advanced degree and had performed some work in rehabilitation services prior to working at Creoks. Despite these qualifications, plaintiff was terminated from her job. There is no indication from the summary judgment record that the positions of individual rehabilitation specialist or case manager were eliminated. Thus, plaintiff has satisfied her burden of establishing a prima facie case of discrimination.

Although plaintiff has established a prima facie case, defendant has set forth legitimate, non-discriminatory reasons for her termination. Defendant terminated plaintiff because of her inability to follow Creoks' policies, her conflicts with co-employees, and because she was causing Creoks to lose money. None of these proffered reasons are related to plaintiff's religion.

Plaintiff submitted no evidence from which a reasonable person could infer that defendant's legitimate, non-discriminatory reasons for terminating plaintiff were mere pretext for unlawful discrimination. Plaintiff's primary evidence of religious discrimination is that her co-employee, Milton, said that she was "shocked" that plaintiff was a Jehovah's Witness. This isolated comment about plaintiff's religion does not raise an inference of religious discrimination. On the contrary, Milton's statement occurred in a private phone conversation between plaintiff and Milton outside of work hours. Dkt. # 49, Edwards Deposition, Part 2, at 17. Given this context, a reasonable trier of fact could not interpret Milton's comment to raise an inference of religious discrimination on the part of defendant.

13

Further, the fact that plaintiff was reprimanded for teaching religion to clients does not create a genuine issue of material fact as to the alleged religious discrimination.  Plaintiff agrees that it was inappropriate to teach religion to clients; she merely maintains that her teaching a client how to read and study the Bible did not constitute religious "witnessing."  This disagreement about what constitutes impermissible religious teaching is not relevant to the religious discrimination inquiry.

Plaintiff cannot point to any other evidence of religious discrimination.  In her deposition, plaintiff testified as follows:

> Q: You never experienced any – other than Audrey Milton saying, "I'm shocked that you're a Jehovah's Witness," no one made derogatory statements or slurs to you directly?
> A: Nobody made slurs to me, no, but they were critical --
> Q: How were they critical?
> A: – and they made issues.  Just like Pat – and I still believe today she set me up to work with that client to try to say that I was teaching religion.
> Q: Why would she set you up?
> A: Because they wanted to get rid of me and because she don't care for Jehovah's Witnesses herself.
> Q: How do you know that?
> A: Well, for one thing she's a Lutheran pastor.  Didn't I send you that information? Lutherans are very liberal, and they don't care for Jehovah's Witnesses.
> Q: And what evidence do you have that her being a Lutheran somehow caused her to discriminate against you because of your religion?
> A: Well, you know what?  It's a lot of things that I don't know, and that's why I got all these witnesses on the witness list.

Dkt. # 49, Edwards Deposition, Part 2, at 16.  This testimony, and the rest of plaintiff's deposition, show that plaintiff's allegation of religious discrimination rests on her own conclusory statements, which are unsupported by facts in the summary judgment record.  Mere conjecture and subjective beliefs about an employer's motive do not create a genuine issue of material fact.  See, e.g., Bullington v. United Airlines, 186 F.3d 1301, 1318 (10th Cir.1999); Aramburu v. Boeing Co., 112 F.3d 1398, 1408 n.7 (10th Cir.1997).  Plaintiff's statement that evidence of discrimination will be

14

revealed at trial is not sufficient to defeat summary judgment.  On the contrary, the purpose of summary judgment is to determine from the summary judgment record whether there exists a genuine issue of material fact which would entitle plaintiff to a trial.  Based on the summary judgment record, the Court finds that plaintiff has submitted no evidence that defendant's legitimate, non-discriminatory reasons for terminating plaintiff were mere pretext for unlawful discrimination. Thus, defendant is entitled to summary judgment on plaintiff's religious discrimination claim.

### C.

To the extent that plaintiff asserts a hostile work environment claim, the Court finds that defendant is entitled to summary judgment on that claim.  Given that plaintiff did not expressly state a hostile work environment claim in her EEOC complaint, the Court must determine whether her hostile work environment claim is properly before it.  "A plaintiff must exhaust [her] administrative remedies before bringing suit under Title VII."  Aramburu, 112 F.3d at 1409.  This requirement "serves to put an employer on notice of a violation prior to the commencement of judicial proceedings.  This in turn serves to facilitate internal resolution of the issue rather than promoting costly and time-consuming litigation."  Martinez v. Potter, 347 F.3d 1208, 1211 (10th Cir. 2003).

"[W]hen an employee seeks judicial relief for incidents not listed in his original charge to the EEOC, the judicial complaint nevertheless may encompass any discrimination like or reasonably related to the allegations of the EEOC charge."  Id. at 1210 (quoting Ingels v. Thiokol Corp., 42 F.3d 616, 625 (10th Cir. 1994)).  A claim is considered "reasonably related" when "the conduct complained of would fall within the scope of the [administrative] investigation which can reasonably be expected to grow out of the charge that was made."  Deravin v. Kerik, 335 F.3d 195, 200-01 (2d

Cir. 2003).  The reason for this more lenient pleading standard is that employment discrimination charges are frequently filed by employees, like Edwards, who do not have the benefit of counsel.

To determine whether plaintiff's hostile work environment claim is reasonably related to her administrative charges, the Court first looks to the language of the charge itself.  In her EEOC form, plaintiff checked the boxes marked "religion," "retaliation," and "disability."  Dkt. # 49, Ex. H.  In describing the dates of the alleged discrimination, plaintiff provided only one date: March 14, 2005.  Reading plaintiff's EEOC charge liberally, the Court finds that the investigation of her religious discrimination, retaliation, and disability discrimination claims could not reasonably be expected to lead to a hostile work environment claim.  Nothing in plaintiff's EEOC claim, including her general intake questionnaire, lays a factual foundation for a hostile work environment claim.  To make such a claim, plaintiff must allege facts indicating a workplace "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  David v. United States Postal Serv., 142 F.3d 1334, 1341 (10th Cir. 1998) (quotation omitted).  Plaintiff's EEOC charge contains no factual descriptions of treatment sufficient to allege a hostile work environment.  Thus, plaintiff did not exhaust her administrative remedies with respect to her hostile work environment claim, and the Court cannot address such a claim.  See Seymore v. Shawver & Sons, Inc., 111 F.3d 794, 799 (10th Cir. 1997) (noting that a failure to file an administrative Title VII claim before bringing suit is jurisdictionally fatal).

**D.**

Plaintiff also claims that defendant retaliated against her in violation of Title VII after she filed a claim for unemployment compensation.[3]  Section 2000e-3(a) of Title VII states:

> It shall be unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice <u>by this subchapter</u> [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing <u>under this subchapter</u>.

42 U.S.C. §2000e-3(a) (emphasis added).  The Tenth Circuit has recognize three elements for a retaliation claim under Title VII: (1) plaintiff engaged in protected opposition to discrimination; (2) plaintiff suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action.  <u>O'Neal v. Ferguson Constr. Co.</u>, 237 F.3d 1248, 1252 (10th Cir. 2001).  Here, plaintiff did not engage in protected opposition to discrimination; filing for unemployment compensation in entirely unrelated to Title VII.  Because plaintiff did not engage in a "protected activity" under Title VII, defendant is entitled to summary judgment on plaintiff's retaliation claim.[4]

**E.**

As noted in Section A, above, the Court finds that plaintiff was an independent contractor and thus not entitled to protection under the ADA.  Even if plaintiff were an employee of Creoks,

---

[3]     Here, plaintiff filed an unemployment compensation claim <u>before</u> she was terminated by Creoks.

[4]     Filing for unemployment compensation is not a protected activity under the ADA either. Thus, to the extent that plaintiff brings a retaliation claim under the ADA, the Court grants defendant's motion for summary judgment with respect to that claim.

however, the Court finds that defendant is entitled to summary judgment on plaintiff's disability discrimination claim.

The Court examines plaintiff's disability discrimination claim under the <u>McDonnell Douglas</u> burden-shifting analysis described in Section B, above.  <u>McKenzie v. City and County of Denver</u>, 414 F.3d 1266, 1274 (10th Cir. 2005); <u>Butler v. City of Prairie Village, Kansas</u>, 172 F.3d 736, 747 (10th Cir. 1999) ("ADA cases without direct evidence of discrimination generally are evaluated under the burden-shifting framework established in McDonnell Douglas . . . ").  To establish a prima facie case of discrimination under the ADA, plaintiff must demonstrate: (1) that she is "disabled" within the meaning of the ADA; (2) that she is qualified – with or without reasonable accommodation; and (3) that she was discriminated against because of her disability.  <u>Butler</u>, 172 F.3d at 748; <u>Siemon v. AT&T Corp.</u>, 117 F.3d 1173, 1175 (10th Cir. 1997).  Here, the Court finds that plaintiff has failed to establish either the first or third prongs of the prima facie case.

The ADA defines disability as either: (1) a physical or mental impairment that substantially limits one or more of an individual's major life activities, 42 U.S.C. § 12102(2)(A): (2) a record of such an impairment, 42 U.S.C. § 12102(2)(C); or (3) being regarded as having such an impairment, 42 U.S.C. § 121012(2)(C). An analysis under 42 U.S.C. § 12102(2)(A)[5] requires a three-step inquiry: (1) whether plaintiff's generalized anxiety disorder is a physical or mental impairment; (2) whether plaintiff has identified a major life activity under the ADA; and (3) whether the impairment substantially limited the major life activity.  <u>Bragdon v. Abbott</u>, 524 U.S. 624, 631 (1998); <u>MacKenzie</u>, 414 F.3d at 1275.  "[W]hether a claimed affliction constitutes an impairment under the

---

[5]     There is no evidence that there was a record of plaintiff's impairment (other than a post-termination letter from the Oklahoma Department of Rehabilitation Services, Dkt. # 50, Ex. 10, at 3) or that defendant regarded plaintiff as having such an impairment.

ADA and whether the identified endeavor constitutes a major life activity are determinations of law for the court to decide." MacKenzie, 414 F.3d at 1275 (quoting Poindexter v. Atchison, Topeka & Santa Fe Ry Co., 168 F.3d 1228, 1230 (10th Cir. 1999)).

Here, plaintiff's alleged disability is a generalized anxiety disorder. Plaintiff does not provide any evidence that this impairment substantially limits any major life activity. On the contrary, she maintains that she was capable of performing her work adequately, but had problems dealing with pressure. While plaintiff cannot manage high levels of stress, she has not shown that she is "significantly restricted" in performing a major life activity "as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii). With respect to the major life activity of working, plaintiff has not shown that she is unable to perform either a class of jobs or a broad range of jobs in various classes. Doebele v. Sprint/United Mgmt. Co., 342 F.3d 1117, 1134 (10th Cir. 2003). In sum, the Court concludes as a matter of law that plaintiff has failed to establish that she is disabled under the ADA.

Further, plaintiff fails to establish the third prong of her prima facie case of disability discrimination. Under the third prong, plaintiff must show that she was terminated because of her disability, or that defendant terminated plaintiff "under circumstances which give rise to an inference that the termination was based on her disability." Butler, 172 F.3d at 748 (quoting Morgan, 108 F.3d at 1323). This showing "requires the plaintiff to present some affirmative evidence that disability was a determining factor in the employer's decision." Id. (quoting Morgan, 108 F.3d at 1324). Here, even viewing the record in the light most favorable to plaintiff, there is no evidence that defendant's decision to terminate plaintiff was due to her generalized anxiety disorder. On the

contrary, plaintiff testified that she did not inform defendant of her disability.   According to Edwards,

> There was no need to [tell management about my disability].   I needed no accommodations.  I – I have – I can do my job, and I can do it well.  I have problems within myself, and I have problems when I'm being pressured or whatever.

Dkt. # 49, Edwards Deposition, Part 2, at 19.  Plaintiff testified that she told only Milton about her disability.  The fact that one non-supervisory employee knew about plaintiff's disability does not create a genuine issue of material fact with respect to plaintiff's disability claim.

**F.**

In addition to her federal claims under Title VII and the ADA, plaintiff brings a state law claim of defamation.  To recover for defamation, a private figure must prove (1) a false and defamatory statement, (2) an unprivileged publication to a third party, (3) fault amounting at least to negligence on the part of the publisher; and (4) either the actionability of the statement irrespective of special damage, or the existence of special damage caused by the publication.  Trice v. Burress, 137 P.3d 1253, 1257 (Okla. Ct. App. 2006).

Here, plaintiff's defamation claim fails as a matter of law because the allegedly false statements were made by an outside party.   In her complaint, plaintiff alleges, "Defendant contributed to Plaintiff's defamation of character when a slanderous individual defaming Plaintiff [sic] character contacted Defendant." Dkt. # 1, at 4.  Throughout her deposition testimony, plaintiff refers to her "slanderer", whom she claims called Creoks and made false statements about her.  See, e.g., Dkt. # 49, Ex. G.  Plaintiff does not contend that this "slanderer" was employed or even affiliated with Creoks.  Even assuming arguendo that this alleged "slanderer" made a defamatory

20

statement about plaintiff,[6] defendant is not liable for such defamation.  Creoks' failure to investigate

these allegedly defamatory remarks certainly does not amount to defamation on the part of defendant

itself.

Even with respect to allegedly defamatory statements by Creoks employees, defendant is

entitled to summary judgment on plaintiff's defamation claim.  In describing her defamation claim,

plaintiff testified as follows:

> Q: And what – what specific acts did Creoks do to defame your character?
> A: Well – and again, I'm not exactly sure, but I know that it was done from Creoks,
> and I feel like Audrey Milton and Pat Hartmuller had a lot to do with it.  Audrey
> Milton told me herself that she thought I had a learning disability or that Brent
> wasn't training me properly, which – which neither one was true.
> Q: What specific acts did Creoks do to defame your character?
> A: Talk was put out about me from Creoks to – to defame my character.
> Q: Talk from –
> A: Negative talk.
> Q: From who?
> A: And again, I suspect.
> Q: Who made defamatory statements at Creoks?
> A: Audrey Milton and – and Pat Hartmuller.  And – and Carla Kirby told me that Pat
> was dragging gossip – all that gossip around Creoks about me.
> Q: And what specific statements did Pat Harmuller and Audrey Milton say that
> defamed your character?
> A: And – but that's the reason why I'm bringing witnesses in, into the courtroom.
> Q: Well, what specific statements? . . .
> A: I told you the specific statements.  And they – they were saying that I was
> schizophrenic.  And Audrey was using my disability . . . to make it appear that I
> wasn't capable of doing my job at Creoks.

Dkt. # 49, Edwards Deposition, Part 1, at 28.  First, plaintiff has submitted no evidence that

Hartmuller made any defamatory statement about her.  Plaintiff testified, "I don't know exactly what

[Hartmuller] said, but I – it's my feeling that something was said when my slanderer called that

---

[6]      In fact, there is no indication who this alleged "slanderer" is or what he/she said to Creoks
employees.

offended her." <u>Id.</u>, Part 2, at 1.  Once again, plaintiff's defamation claim rests on statements by her alleged "slanderer."  Plaintiff's "feeling" that Hartmuller defamed her does not create a genuine issue of material fact.

With respect to the statement made by Milton, the Court also finds that there is no genuine issue of material fact concerning the alleged defamation.  Even assuming <u>arguendo</u> that Milton's statements that plaintiff had a learning disability or was schizophrenic were false and defamatory in nature, there is no evidence that these statements were published.  To the extent that Milton made such statements to other Creoks employees, such communication is not evidence of publication. "Communication inside a corporation, between its officers, employees, and agents, is never publication for the purposes of actions for defamation."  <u>Thornton v. Holdenwill Gen. Hospital</u>, 36 P.3d 456, 460 (Okla. Civ. App. 2001).

Plaintiff makes some vague allegations that Creoks' employees made defamatory statements about her to persons outside of Creoks.  She testified:

> Q: Well, who heard – who heard these defamatory comments?  Just point to a name on this [witness] list.
> A: All of –
> Q: You said that you could point them out if there was somebody on this list.
> A: All of them did.  I wouldn't – if they weren't on the witness list, I wouldn't have them on there.
> Q: Ms. Edwards, who specifically heard the statements?
> A: The people on the – on the – on the witness list.
> Q: So every one of these people hear a statement –
> A: They can tell –
> Q: – heard a statement –
> A: Well, they heard – they know about it.
> Q: – heard a direct statement?
> A: They know about it.

<u>Id.</u> at 2.  As noted above, however, plaintiff cannot rely upon her conjecture as to the testimony of listed witnesses to create a genuine issue of material fact.  Other than plaintiff's vague statements

that "they [witnesses] know about it," there is simply no evidence in the summary judgment record that any allegedly defamatory statements were published. Therefore, the Court grants defendant's motion for summary judgment on plaintiff's defamation claim.

## G.

To the extent that plaintiff brings a claim for intentional infliction of emotional distress,[7] the Court also grants defendant's motion for summary judgment with respect to that claim. In order to prevail on a claim for intentional infliction of emotional distress, plaintiff must show that: (1) defendant acted intentionally or recklessly; (2) defendant's conduct was extreme and outrageous; (3) defendant's conduct caused plaintiff emotional distress; and (4) the resulting emotional distress was severe. Computer Publ'ns, Inc. v. Welton, 49 P.3d 732, 735 (Okla. 2002). Recovery under this theory is governed by very narrow standards, however, and "it is the trial court's responsibility initially to determine whether the defendant's conduct may reasonably be regarded as sufficiently extreme and outrageous to meet the [Restatement (Second) of Torts § 46] standards." Gaylord Entm't Co. v. Thompson, 958 P.2d 128, 149 (Okla. 1998). Plaintiff must show that defendants engaged in conduct that was not only unreasonable but also was "beyond all possible bounds of decency in the setting in which it occurred" and was such that it can be "regarded as utterly intolerable in a civilized community." Id. at 149 n.92 (citation omitted). "[C]onduct is not extreme

---

[7]    Plaintiff's complaint reads: "Defendant willfully and wrongfully contributed to Plaintiff's severe emotional and mental stress while she was in their employment." Dkt. # 1, at 9. She further alleges, "Defendant was well aware of how this severe emotional and mental [sic] would affect an individual, especially having the disability Plaintiff has." Id. Though defendant does not address intentional infliction of emotional distress in its motion for summary judgment, the Court finds that plaintiff's complaint, read liberally, states such a claim.

and outrageous if it amounts to no more than mere insults, indignities, or petty oppressions." <u>Daemi</u> <u>v. Church's Fried Chicken, Inc.</u>,  931 F.2d 1379, 1388 (10th Cir. 1991).

Oklahoma courts have examined a variety of conduct claimed to be outrageous in the employment context, setting a very high standard for actionable conduct.  <u>See</u> <u>Eddy v. Brown</u>, 715 P.2d 74 (Okla. 1986) (supervisor and foreman ridiculing plaintiff in the workplace not actionable); <u>Mirzaie v. Smith Cogeneration, Inc.</u>, 962 P.2d 678 (Okla. Civ. App. 1998) (employer calling plaintiff in the middle of the night and browbeating him for hours, requiring him to do unnecessary work, and making derogatory sexual comments about plaintiff's fiancee not actionable); <u>Anderson</u> <u>v. Oklahoma Temporary Services, Inc.</u>, 925 P.2d 574 (Okla. Civ. App. 1996) (six events over a two-year period, including supervisor making lewd remarks about plaintiff and embarrassing her by discussing her faults with co-workers, not actionable).   Similarly, the Tenth Circuit, interpreting Oklahoma law, has reinforced the high burden to be met for liability for intentional infliction of emotional distress.  <u>See</u> <u>Daemi</u>, 931 F.2d at 1388 (affirming district court decision that employer who called employee derogatory names based on national origin, compelled him to terminate or otherwise eliminate his Iranian subordinates because of their national origin, impugned his integrity by accusing him of criminal acts and requiring him to take a polygraph, and ridiculed him publicly at seminars not actionable in tort for intentional infliction of emotional distress).

Here, plaintiff does not describe any conduct by defendant that could be considered extreme and outrageous.  Even when viewed in the light most favorable to the plaintiff, no reasonable person could conclude that any of defendant's actions, if proven, were "so extreme and outrageous as to go beyond all possible bounds of decency and would be considered atrocious and utterly intolerable in

a civilized society . . ." Sturgeon, 987 P.2d at 1227. Defendant is entitled to summary judgment on plaintiff's claim for intentional infliction of emotional distress.

## H.

The Court also interprets plaintiff's complaint to state a claim for breach of contract and/or bad faith breach of contract. Plaintiff's complaint reads: "The Defendant falsely and fraudulently with intent to deceive and in order to induce the plaintiff to enter into Defendants employment made [sic] certain false representations." Dkt. # 1, at 3. It further states: "Defendant in bad faith led Plaintiff to believe that within a few months the Defendants employment [sic] would offer her more work than she could handle, promising her a monthly salary in the area of $3,000.000 [sic]. Defendant promised Plaintiff in bad faith that LPCs employed by Defendant would refer clients to Plaintiff to work with, as new clients were acquired." Id. Plaintiff also claims that defendant "in bad fad faith lead [sic] Plaintiff to believe she was a contract work and the Defendant had no responsibility to her as her employer." Id. This claim appears to be a bad faith breach of employment contract claim.

Plaintiff claims that defendant, in bad faith, induced her to sign the Subcontractor Agreement based on representations that she would receive a certain amount of work from LPCs. Under Oklahoma law, "the courts have generally refused to recognize a cause of action for breach of the contractual implied duty of good faith outside the bounds of the insured/insurer and employer/employee relationships." Robinson v. Southerland, 123 P.3d 35, 44 (Okla. Ct. App. 2005). With respect to the implied duty of good faith in employer/employee relationships, the Oklahoma cases generally involve actions to recover for the wrongful termination of employment. See, e.g., id.; Stickney v. Kansas City Life Ins. Co., 25 P.3d 924, 927 (Okla. Civ. App. 2000); Hinson v.

Cameron, 742 P.2d 549, 553-54 (Okla. 1987).   In the termination of employment contracts, Oklahoma courts have held that "recovery is allowed for the bad faith breach of the employment contract only upon a showing of some 'intent to wrongfully deprive [a contracting party] of the fruits of his contract.'" Robinson, 123 P.3d at 44 (quoting Hall v. Farmers Ins. Exch., 713 P.2d 1027, 1030 (Okla. 1985)). Assuming arguendo that plaintiff can bring a bad faith claim based on the "inducement" to enter the employment contract as opposed to termination of employment, the Court finds that there is no genuine issue of material fact as to defendant's alleged bad faith. The Court finds no evidence in the summary judgment record supporting even an inference of defendant's intent to wrongfully deprive plaintiff of the fruits of her contract.

Further, there is no evidence in the summary judgment record that defendant breached its contract with plaintiff in failing to provide her with sufficient clients.  The Subcontractor Agreement states, "Creoks will assign Clinician a caseload of Creoks clients who are believed to be in need of mental health services."  Dkt. # 49, Ex. A.  Nowhere in the agreement does Creoks promise to provide plaintiff with a particular number of clients to sustain a monthly salary of $3,000.  Absent any evidence of a breach of contract, plaintiff's breach of contract claim cannot be submitted to a jury.  The Court finds that defendant is entitled to summary judgment on plaintiff's breach of contract and/or bad faith breach of contract claims.

## IV.

In summary, the Court grants defendant's motion for summary judgment with respect to all of plaintiff's claims.  The Court finds that plaintiff was an independent contractor, not an employee of Creoks; thus, she is not protected by either Title VII or the ADA.  But even if plaintiff were an employee, defendant is entitled to summary judgment on both plaintiff's Title VII and ADA claims.

Plaintiff submitted no evidence that defendant's proffered reason for her termination was pretextual. She also failed to establish a prima facie case of disability discrimination under the ADA. Further, plaintiff's filing for unemployment compensation does not constitute a "protected activity" under either Title VII or the ADA. With respect to her state law claims, defendant is entitled to summary judgment on her defamation, intentional infliction of emotional distress, and breach of contract claims.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Dkt. # 48) is hereby **granted**. A separate judgment is entered herewith.

**DATED** this 25th day of January, 2007.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT